UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GREENROOTS, INC. and CONSERVATION LAW FOUNDATION, | Civil Action No. 1:21-cv-10065 |
| Plaintiffs, | COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
| v. | |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and ANDREW WHEELER, Administrator of the Environmental Protection Agency, in his official capacity, | |
| Defendants. | |

INTRODUCTION

1.     GreenRoots, Inc. and the Conservation Law Foundation (collectively, "Plaintiffs")

bring this action for declaratory and injunctive relief to challenge the failure of

Defendants U.S. Environmental Protection Agency ("EPA") and Administrator Andrew

Wheeler (collectively, "Defendants") to enforce Title VI of the Civil Rights Act of

1964, 42 U.S.C. § 2000d *et seq*. ("Title VI") and the EPA's Title VI implementing

regulations, 40 C.F.R. §§ 7.10 *et seq*. Defendants unlawfully and erroneously

dismissed, on jurisdictional grounds, Plaintiffs' administrative complaint (the

"Administrative Complaint") against a state recipient of significant EPA funds and its

two subagencies. By this lawsuit, Plaintiffs seek an order compelling Defendants to

accept jurisdiction over the Administrative Complaint and investigate it as required under the law.

2.  Plaintiffs filed the Administrative Complaint with the EPA on June 1, 2020, alleging national origin discrimination in violation of Title VI. As Respondents, Plaintiffs named the Massachusetts Executive Office of Energy and Environmental Affairs ("EOEEA"), a recipient of federal funding from EPA, as well as the Massachusetts Department of Public Utilities ("DPU") and the Massachusetts Energy Facilities Siting Board ("Siting Board"), two entities within the EOEEA. A true copy of the Administrative Complaint is attached as **Exhibit A**.

3.  Plaintiffs sought redress for the failure of Respondents, who oversee the review, permitting, and siting process for energy facilities within the Commonwealth of Massachusetts, to provide meaningful access to that public process for individuals with limited English proficiency in relation to a decision to site an electrical substation in a predominantly Spanish speaking immigrant community. The Administrative Complaint alleged that Respondents' failure constitutes national origin discrimination and noncompliance with Title VI.

4.  EPA has jurisdiction over EOEEA because the latter has received, and is presently receiving, funding from the federal agency. EPA has jurisdiction over DPU and the Siting Board because those entities are housed within EOEEA, such that their operations are considered "programs or activities" of EOEEA within the meaning of Title VI and related jurisprudence.

5.  Nonetheless, on June 29, 2020, the EPA informed Plaintiffs that the agency "has determined that it will reject and close the complaint against DPU and the Board . . . for

lack of personal jurisdiction….” (hereinafter, the “First Jurisdictional Decision.”). A true copy of that letter is attached as **Exhibit B.**

6.  The First Jurisdictional Decision acknowledged that the agency had jurisdiction over EOEEA. However, on July 27, 2020, the EPA informed Plaintiffs that the EPA was “rejecting for investigation” the Administrative Complaint filed against EOEEA because it was “not clear” that the Executive Office “has direct authority to address the specific issues raised in the complaint” regarding the inadequate provision of language access (hereinafter, the “Second Jurisdictional Decision”). A true copy of that letter is attached as **Exhibit C.**

7.  Defendants’ Jurisdictional Decisions are incorrect as a matter of law. The EPA is bound by its statutory mandate to enforce civil compliance by entities that receive federal funding from the agency, such as EOEAA, and by any program and activity of a recipient, such as DPU and the Siting Board.

8.  Plaintiffs cannot appeal EPA’s Jurisdictional Decisions directly to EPA under the agency’s Title VI implementing regulations and have no other recourse at law.

9.  Accordingly, Plaintiffs now ask the Court to declare that the Jurisdictional Decisions violate the Administrative Procedure Act, 5 U.S.C. s. 701, *et seq*. (hereinafter, “APA”) and Title VI and are therefore void and without legal force or effect. Plaintiffs also ask the Court to issue an injunction compelling the EPA to assert jurisdiction over Plaintiffs’ administrative complaint and remand the complaint to the agency for completion of its complaint investigation procedures under 40 C.F.R. Part 7 consistent with the timelines those regulations establish.

PARTIES

10. Plaintiff GreenRoots, Inc. is a not-for-profit, community-based organization dedicated to improving and enhancing the urban environment and public health of Chelsea, Massachusetts and the surrounding communities, including East Boston. For twenty years, GreenRoots has engaged in ecological restoration activities, provided educational activities, convened educational events, held meetings, and organized local groups and individuals on a broad range of issues impacting the health and environment of Chelsea and Greater Boston residents, many of whom are low-income, Limited English Proficient (LEP) residents of color.

11. GreenRoots maintains its principal place of business in Chelsea, Massachusetts.

12. Plaintiff Conservation Law Foundation ("CLF") is a not-for-profit, member-supported organization dedicated to protecting New England's environment. CLF protects New England's environment for the benefit of all people and uses the law, science, and the market to create solutions that preserve our natural resources, build healthy communities, and sustain a vibrant economy. CLF's mission includes working to end the unfair environmental burdens imposed on low-income communities of color and safeguarding the health and quality of life of all New England communities.

13. CLF maintains its principal place of business in Boston, Massachusetts.

14. Together, Plaintiffs GreenRoots and CLF filed the Administrative Complaint with the EPA on June 1, 2020.

15. Defendant Environmental Protection Agency is a department of the Executive Branch of the United States Government. The EPA has the authority to provide grants and other financial assistance to local and state programs and activities, 40 C.F.R. Ch.1,

Subch. B, and must investigate compliance with Title VI to ensure that no person is excluded from participation in, denied the benefits of, or is subjected to discrimination under any program or activity receiving EPA assistance on the basis of race, color, national origin, or on the basis of sex. 40 C.F.R. § 7.30.

16. Defendant Andrew S. Wheeler is the Administrator of the Environmental Protection Agency and as such, is responsible for overseeing all operations of the Agency, including the External Civil Rights Compliance Office and agency compliance with and enforcement of governing statutes, including Title VI. Administrator Wheeler is sued in his official capacity.

## JURISDICTION AND VENUE

17. This Court has jurisdiction over this matter under 28 U.S.C. § 1331, 7 U.S.C. § 7, and 28 U.S.C. § 2201.

18. Venue is proper in this Court under 28 U.S.C. § 1391 because both Plaintiffs have their principal places of business in Massachusetts.

## LEGAL BACKGROUND

**Congress has broadened the reach of Title VI through the Civil Rights Restoration Act**

19. Section 601 of Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

20. As the Supreme Court has observed, the "voluminous legislative history of Title VI reveals a congressional intent to halt federal funding of entities that violate a prohibition of racial discrimination similar to that of the Constitution." *Regents of U. of Cal. v. Bakke*, 438 U.S. 265, 284 (1978).

21. Remarking on the centrality of Title VI to the federal government's effort to stamp out discrimination, President John F. Kennedy told Congress that "indirect discrimination, through the use of Federal funds, is just as invidious [as direct discrimination]; and it should not be necessary to resort to the courts to prevent each individual violation." President John F. Kennedy, *Special Message to the Congress on Civil Rights and Job Opportunities*, THE AM. PRESIDENCY PROJECT (June 19, 1963), available at: https://www.presidency.ucsb.edu/node/236711.

22. The rules, regulations, or orders promulgated under section 602 of Title VI empower "[e]ach Federal department and agency" to "effectuate the provisions" of section 601 in their extension of federal financial assistance to "any program or activity." 42 U.S.C. § 2000d-1. Additionally, such rules, regulations, or orders may also proscribe conduct that has a disparate impact on protected groups and individuals. *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001); *see, e.g.*, 40 C.F.R. § 7.35(b)-(c) (stating that EPA grantees, in relevant part, "shall not use criteria or methods of administering [their] program or activity which have the *effect* of subjecting individuals to discrimination or . . . have the *effect* of defeating or substantially impairing accomplishment of the objectives of the program or activity" and "shall not choose a site or location of a facility that has the purpose *or effect* of excluding individuals from, denying them the benefits of, or

subjecting them to discrimination under any program or activity to which the [regulation] applies") (emphases added).

23. As the Second Circuit has observed, "clever men may easily conceal their motivations"; a facially neutral rule may "bear no relation to discrimination upon passage, but develop into powerful discriminatory mechanisms when applied." *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 935 (2d. Cir. 1988) (citation omitted), *superseded by regulation on other grounds*, 78 Fed. Reg. 11, 460 (Feb. 13, 2013).

24. Section 602, and the accompanying agency regulations, has served an essential civil rights purpose, since the Supreme Court held in *Alexander v. Sandoval* that there is no implied private right of action under the disparate impact provisions of Title VI. *Sandoval*, 532 U.S. at 293.

25. The administrative complaint mechanism allows victims of discrimination to bring their claims to federal agencies, who are empowered to carry out comprehensive investigations of their own funding recipients and to seek compliance without resorting to adversarial judicial proceedings.

26. Congress has taken affirmative action to codify the broad scope of Title VI's coverage. In 1984, the Supreme Court decided *Grove City College v. Bell*, 465 U.S. 555 (1984), holding that the receipt of basic educational opportunity grants by a college's students did "not trigger institution-wide coverage under Title IX" of the Education Amendments of 1972. *Id*. at 573. Instead, the Court determined that the grants represented federal financial assistance only to the college's financial aid program, such that that program alone could be properly regulated under Title IX. *Id*. at 573-74.

27.  Congress enacted the Civil Rights Restoration Act in 1988 in response to this

"unacceptable decision." *Franklin v. Gwinnett Cnty. Public Schools*, 503 U.S. 60, 73

(1992). Congress stated its intent plainly in the title: "An Act to restore the broad scope

of coverage and to clarify the application of Title IX, section 504 of the Rehabilitation

Act of 1973, the Age Discrimination Act of 1975, and Title VI of the Civil Rights Act

of 1964." Civil Rights Restoration Act of 1987, Pub. L. 100-259, 102 Stat. 28

(hereinafter, "CRRA").

28.  Finding that the Supreme Court had "unduly narrowed or cast doubt upon the broad

application . . . of Title VI" and that "legislative action is necessary to restore the . . .

broad, institution-wide application" of that law, Congress specifically amended Title VI

to reflect the following:

> For the purposes of this title, the term "program or activity" and
> "program" mean all of the operations of –
>
> (1)(A) a department, agency, special purpose district, or other
> instrumentality of a State or of a local government; or
>
> (B) the entity of such State or local government that distributes
> such assistance and each such department or agency (and
> each other State or local government entity) to which the
> assistance is extended, in the case of assistance to a State or
> local government; ….
>
> any part of which is extended Federal financial assistance . . . .

CRRA, at § 908.

29.  Congress emphasized that the definitions were intended to "make clear that

discrimination is prohibited through *entire* agencies or institutions if *any part* received

Federal financial assistance." S. Rep. No. 64, 100[th] Cong., 2d Sess. 4 (emphases added);

*see also Comfort ex rel. Neumyer v. Lynn School Comm.*, 131 F.Supp.2d 253, 255 n.4

(D. Mass. 2001) (observing that while prior to 1988, courts only applied Title VI to the "specific programs that received federal funds," the CRRA "incorporated a broader concept of 'program or activity' to include all of the operations of a federally funded institution that conducted the program or activity.").

**The EPA's Title VI regulations incorporate expansive language access protections**

30.   EPA enforces Title VI through regulations codified at 40 C.F.R. Chapter I, Subchapter A, Part 7, Nondiscrimination in Programs or Activities Receiving Federal Assistance from the Environmental Protection Agency.

31.   The regulation's application is broad, applying to "all applicants for, and recipients of, EPA assistance in the operation of programs or activities receiving such assistance beginning February 13, 1984." 40 C.F.R. § 7.15 (2010).

32.   Critically, and consistent with the CRRA, EPA defines "program or activity" and "program" to include "all of the operations" of a

> [D]epartment, agency, special purpose district, or other instrumentality of a State or of a local government; or the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government.

*Id*. at § 7.25.

33.   The regulation specifically reaches conduct that has a disparate impact, barring the use of criteria or methods of administering the program or activity "which have the effect of subjecting individuals to discrimination because of their race, color, [or] national origin . . . . or have the effect of defeating or substantially impairing accomplishment of

the objectives of the program or activity" with respect to individuals of a particular

race, color, or national origin. *Id*. § 7.35(b).

34. Disparate impact doctrine is especially critical for establishing language discrimination,

which is well established in "longstanding case law, federal regulations, and agency

interpretation of those regulations" as a form of national origin discrimination under

Title VI. *United States v. Maricopa Cnty., Ariz.*, 915 F.Supp.2d 1073, 1079 (D. Ariz.

2012).

35. Failure to provide language access "exclude[s] and subordinate[s] LEP people,

particularly Spanish-speaking Latinos, in a variety of contexts, including employment,

education, domestic relations, access to healthcare and public services, and

participation in democracy." Jasmine B. Gonzales Rose, *Race Inequity Fifty Years*

*Later: Language Rights Under the Civil Rights Act of 1964*, 6 ALA. C.R. & C.L. L. REV.

167, 174 (2014); *see also* Enforcement of Title VI-National Origin Discrimination

Against Persons with Limited English Proficiency, 65 Fed. Reg. 50,123, 50,124 (Aug.

16, 2000) (noting that "[t]he Department of Justice has consistently adhered to the view

that the significant discriminatory effects that the failure to provide language assistance

has on the basis of national origin, places the treatment of LEP individuals comfortably

within the ambit of Title VI and agencies' implementing regulations" (*citing* 28 C.F.R.

§ 42.405(d)(1) (1976)).

36. The list of specifically prohibited discriminatory actions was expounded upon in the

*Guidance to Environmental Protection Agency Financial Assistance Recipients*

*Regarding Title VI Prohibition Against National Origin Discrimination Affecting*

*Limited English Proficient Persons*, Docket No. FRL-7776-6 (June 25, 2004).

37.  In general, recipients must "take reasonable steps to ensure meaningful access" to their

programs and activities by individuals with limited proficiency in English. *Id*. at 35604

n. 19. This begins with an individualized assessment that balances the following four

factors:

> (1) The number or proportion of LEP persons eligible to be
> served or likely to be encountered by the program or grantee; (2)
> the frequency with which LEP individuals come in contact with
> the program; (3) the nature and importance of the program,
> activity or service provided by the program to people's lives; and
> (4) the resources available to the grantee/recipient and costs.

*Id*. at 35606.

38.  The External Civil Rights Compliance Office (ECRCO) within the EPA's Office of

General Counsel is responsible for conducting investigations upon receipt of a Title VI

complaint to ensure that federal funding recipients are complying with their civil rights

obligations.

## FACTUAL ALLEGATIONS

39.  On June 1, 2020, Plaintiffs filed the Administrative Complaint with the External Civil

Rights Compliance Office of the EPA alleging national origin discrimination in

violation of Title VI and its implementing regulations by Respondents.

40.  In brief, the Administrative Complaint alleged that, over a period of several years,

Respondents continually failed to ensure the meaningful participation of Limited

English Proficient residents throughout the review, comment, and approval process for

an electrical substation and transmission lines (the "East Eagle Reliability Project") in

East Boston and Chelsea, two predominately Spanish-speaking immigrant environmental justice communities in Massachusetts.

41.  These failures include, but are not limited to:

    a.  Refusing to provide interpretation to ensure that individuals with Limited English Proficiency could participate in public hearings;

    b.  Providing inadequate interpretation such that individuals with Limited English Proficiency were functionally excluded from public hearings; and

    c.  Translating vital documents days after English versions were published, such that Spanish-speaking residents were given considerably less time to submit public comments than their English-speaking neighbors.

42.  The Administrative Complaint laid out, in detail, the relationship between the three state entities.

43.  EOEEA is one of eight executive departments within the office of the Governor of Massachusetts. *See* Commonwealth of Massachusetts, *State Government Organizational Chart*, MASS.GOV (Aug. 10, 2018), available at: https://budget.digital.mass.gov/bb/gaa/fy2019/app_19/ga_19/hcdefault.htm.

44.  EOEEA is the primary agency of the Commonwealth for environmental planning and is charged with, as relevant here, "analyz[ing] and mak[ing] recommendations, in cooperation with other state and regional agencies, concerning the development of energy policies and programs in the Commonwealth." M.G.L. c. 21A, § 2(17).

45.  In Fiscal Year 2019 and 2020, EOEEA received $1,347,340 in federal funding from EPA. At the time of the filing of the Administrative Complaint on June 1, 2020, EOEEA was in receipt of nine grants from EPA.

46. Several of EOEEA's sub-agencies received federal funding from the EPA in Fiscal Years 2019 and 2020, including the Massachusetts Department of Environmental Protection, the Department of Agricultural Resources, the Massachusetts Department of Fish and Game, and the Massachusetts Clean Water Trust (formerly the Water Pollution Abatement Trust). *See* M.G.L. c. 21A, § 7 (listing departments contained in EOEEA); M.G.L. c. 21A, § 8 (listing offices contained within the office of the Secretary of EOEEA).

47. EOEEA's enabling statute also requires the agency to "represent and act on behalf of the commonwealth in connection with federal grant programs." M.G.L. c. 21A, § 2(25).

48. DPU is one of seven departments contained within EOEEA. M.G.L. c. 21A, § 7; *see also* Commonwealth of Massachusetts, *State Government Organizational Chart*, *supra*.

49. DPU is responsible for the oversight of investor-owned electric power, natural gas, and water utilities in the Commonwealth, regulating safety in the transportation and gas pipeline areas, and the "siting" of energy facilities. M.G.L. c. 25, § 12N; *see also* Department of Public Utilities, *Who we serve*, MASS.GOV (last accessed January 12, 2021), available at: https://www.mass.gov/orgs/department-of-public-utilities (stating that DPU's mission includes "oversee[ing] the energy facilities siting process.").

50. Under M.G.L. c. 164, § 69H, the Siting Board is established "within" DPU. The Board is chaired by the Secretary of EOEEA and must include the Commissioners of the Department of Environmental Protection and the Division of Energy Resources, or their designees, both of which are housed within EOEEA. *Id*.; *see also* Commonwealth of Massachusetts, State Government Organizational Charts (n.d.), *Department of Public Utilities,* MASS.GOV (last accessed January 12, 2021), available at:

https://budget.digital.mass.gov/bb/gaa/fy2019/app_19/dpt_19/hcdpu.htm (outlining

nested structure in which Energy Facilities Siting Division sits within the

Commissioner's Office of DPU, which sits within EOEEA).

51.    The Siting Board reviews the "need for, cost of, and environmental impacts of

transmission lines, natural gas pipelines, facilities for the manufacture of and storage of

gas, and oil facilities" and is empowered to "approve for review and approval or

rejection any application, petition, or matter related to the need for, construction of, or

siting of facilities" while applying "department and board standards in a consistent

manner." *Id*.

52.    The Administrative Complaint specifically alleged that, given that EOEEA contains a

"department of public utilities," which in turn contains the Siting Board, all of

EOEEA's operations "meet the definition of a 'program or activity' under Title VI."

Exh. A at 10-11.

53.    On June 8, 2020, Deputy Director Dale Rhines wrote to counsel for GreenRoots and

CLF to confirm the EPA's receipt of the Administrative Complaint. A true copy of that

letter is attached as **Exhibit D.**

54.    Deputy Director Rhines stated that the agency would "review the correspondence in

light of EPA's nondiscrimination regulation to determine whether it is a complaint that

falls within [the office's] jurisdiction. Once this jurisdictional review is completed, [the

office] will notify you as to whether it will accept the complaint for investigation, or

reject, or refer the complaint to another Federal agency." Exh. D at 1.

55.   On June 29, 2020, Director Lilian S. Dorka sent an email to counsel for GreenRoots and CLF with the First Jurisdictional Decision, stating that the EPA "has determined that it will reject and close the complaint against DPU and the Board." Exh. B at 1.

56.   The letter stated that the EPA "must reject the complaint filed against DPU and the Board for lack of personal jurisdiction. Specifically, EPA was unable to identify any direct or indirect financial assistance from EPA to DPU or the Board. As a result, ECRCO will reject and close the complaint against these two agencies as of the date of this letter." Exh. B at 2. The First Jurisdictional Decision also stated that ECRCO "has determined that [EOEEA] is a recipient of EPA financial assistance," but that the jurisdictional determination with regard to the agency would follow in a separate letter. Exh. B at 2.

57.   On July 27, 2020, Director Dorka sent counsel for GreenRoots and CLF the Second Jurisdictional Decision, stating that the agency was "rejecting for investigation" the Administrative Complaint filed against EOEEA, but would initiate a compliance review of the agency. Exh. C at 2.

58.   The Second Jurisdictional Decision stated that while EOEEA is a direct recipient of EPA's financial assistance, "it is not clear that [EOEEA] has direct authority to address the specific issues raised in the complaint regarding the Board's implementation of the public participation proceedings tied" to the East Eagle Reliability Project. Exh. C at 2.

59.   The Jurisdictional Decisions are incorrect as a matter of law and reflect a misguided and antiquated application of the Title VI jurisdictional standard. As confirmed by Congress in its passage of the CRRA and the overwhelming weight of subsequent case law, neither the Siting Board nor DPU need be direct or indirect recipients of federal

funds if they are "programs or activities" of EOEEA. As a result, the First Jurisdictional Decision dismissing the Administrative Complaint against DPU and EFSB was legally erroneous and must be set aside under the APA. 5 U.S.C. § 706(2)(A).

60.     Legal error likewise infected the Second Jurisdictional Decision, through which the EPA declined to pursue enforcement action against EOEEA because the EPA lacked clarity as to EOEEA's "direct authority to address the specific issues raised in the complaint regarding [the EFSB's] implementation of the public participation proceedings" at issue.

61.     The EPA's decision is contrary to law. Pursuant to Massachusetts law, DPU (which contains the Siting Board, *see* M.G.L. c. 164, § 69H) is a subagency of EOEEA, subject to the latter's regulatory oversight and authority. *See* M.G.L. c. 21A, §§ 4, 7. EOEEA's compliance with Title VI turns on whether DPU and the Siting Board are "programs or activities" of EOEEA under the Title VI regulations, not on whether EOEEA has "direct authority to address the specific issues raised" about the Siting Board's management of the public participation process. Because the Second Jurisdictional Decision as to EOEEA was the product of legal error, it too must be set aside under the APA. 5 U.S.C. § 706(2)(A).

62.     The Jurisdictional Decisions did not provide GreenRoots and CLF with a thorough or reasoned explanation as their conclusion.

63.     The Jurisdictional Decisions did not even address or analyze the argument—described in detail in the Administrative Complaint—that DPU and the Siting Board constitute "programs or activities" of EOEEA.

64. The Jurisdictional Decisions further fail to provide any basis in law or fact that EOEEA lacks authority to redress the allegations of the Administrative Complaint.

65. The decisions that the EPA does not have personal jurisdiction over DPU or the Siting Board, and that EOEEA lacks the authority to redress the allegations of the Administrative Complaint, are not committed to agency discretion. The EPA has no discretion to disregard the explicit, controlling language of Title VI or its own regulations.

66. The EPA's Jurisdictional Decisions, which "reject[ed] and close[d]" the Administrative Complaint, are final agency actions, within the meaning of the APA.

67. Plaintiffs have no other adequate remedy at law, as the EPA's implementing regulations provide no opportunity for complainants to appeal an agency's jurisdictional determination and no such mechanism was described or noticed in the Jurisdictional Decisions. *See generally* 40 C.F.R. §§ 7.120, 7.130.

68. There is no other regulatory or legal vehicle for Plaintiffs to challenge a jurisdictional determination by the EPA with respect to Title VI coverage.

69. Plaintiffs also cannot bring a disparate impact discrimination lawsuit directly against the state agencies because the Supreme Court has held that there is no private right of action to enforce the disparate impact protections of Title VI. *See Sandoval*, 532 U.S. at 293.

70. Plaintiffs and their members continue to have reasonable concerns about the Board's ongoing failure to provide high-quality, consistent interpretation and translation, that would allow Limited English Proficient residents meaningful access to these critical

proceedings and prevent discrimination against Limited English Proficient residents on the basis of national origin.

71. EPA's Jurisdictional Decisions are incorrect as a matter of law and must be set aside under the APA, with the Administrative Complaint remanded to the EPA for consideration and investigation on the merits.

CLAIMS

COUNT I

Declaratory Judgment, 28 U.S.C. § 2201

72. Plaintiffs adopt by reference the allegations of the preceding paragraphs.

73. For the reasons stated above, Defendants have violated the APA, Title VI and its implementing regulations, and other laws.

74. Plaintiffs seek a declaration to that effect.

75. Defendants' illegal actions have injured and will continue to injure Plaintiffs in numerous ways.

COUNT II

Violation of Administrative Procedure Act, Not in Accordance with the Law

76. Plaintiffs adopt by reference the allegations of the preceding paragraphs.

77. The Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, ensures that federal agencies are accountable to the public by providing a "right of review" to any "person suffering a legal wrong because of agency action, or adversely affected or aggrieved by agency action." 5 U.S.C. § 702. Judicial review extends to "final agency action for which there is no other adequate remedy in court." 5 U.S.C. § 704.

78. The APA directs the federal courts to "hold unlawful and set aside agency actions, findings, and conclusions" that are "not in accordance with law." 5 U.S.C. § 706(2)(A).

79. In issuing the Jurisdictional Decisions, Defendants have violated the clear statutory command of Title VI, as amended by the CRRA, to reject a program-specific approach to Title VI and exercise jurisdiction over all of a recipient's "programs or activities."

80. The Jurisdictional Decisions have caused and will continue to cause harm to Plaintiffs.

81. This Court should vacate and remand the Jurisdictional Decisions to the agency for consideration on the merits under 5 U.S.C. § 706(2)(A) because the Decisions are contrary to Title VI and the EPA's implementing regulations, and are therefore not in accordance with law.

COUNT III

Violation of Administrative Procedure Act, Arbitrary and Capricious

82. Plaintiffs adopt by reference the allegations of the preceding paragraphs.

83. The APA directs federal courts to "hold unlawful and set aside agency actions, findings, and conclusions" that are "arbitrary" or "capricious." 5 U.S.C. § 706(2)(A).

84. The EPA's actions constitute arbitrary and capricious acts because the EPA failed to provide a reasoned analysis as to how it reached its determination that the agency lacked personal jurisdiction over DPU and the Siting Board or its conclusion that it was "not clear" that EOEEA possessed authority to redress the allegations in the Administrative Complaint.

85. The EPA failed to consider or analyze whether DPU and the Siting Board constituted "programs and activities" within the meaning of Title VI and instead, rendered its decision solely on the basis of state entities' receipt of direct or indirect federal funding.

86.  The EPA's arbitrary and capricious conduct, as contained in the Jurisdictional
     Decisions, has caused and will continue to cause harm to Plaintiffs.

87.  The Court should vacate and remand the Jurisdictional Decisions under 5 U.S.C.
     § 706(2)(A) because they are arbitrary and capricious.

COUNT III

Violation of Administrative Procedure Act, Without Lawful Authority

88.  Plaintiffs adopt by reference the allegations of the preceding paragraphs.

89.  The APA directs federal courts to "hold unlawful and set aside agency actions,
     findings, and conclusions" that are "in excess of statutory jurisdiction [or] authority." 5
     U.S.C. § 706(2)(C).

90.  The Jurisdictional Decisions purport to restrict the personal jurisdiction of federal
     agencies to those programs or activities that directly or indirectly receive funding.

91.  The EPA has no statutory power to disregard, overrule, or otherwise alter the reach of
     Title VI.

92.  The EPA's conduct in excess of its statutory authority has caused and will continue to
     cause harm to Plaintiffs.

93.  The Court should vacate and remand the Jurisdictional Decisions under 5 U.S.C.
     § 706(2)(C) because they were issued in excess of the agency's statutory jurisdiction or
     authority.


PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that the Court grant the following relief:

1.  Declare that the Jurisdictional Decisions violate the Administrative Procedure Act, 5
    U.S.C. s. 701, *et seq*., Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et
    seq*., and the EPA's implementing regulations, 40 C.F.R. §§ 7.10 *et seq*. and are
    therefore void and without legal force or effect.

2.  Issue an injunction ordering EPA to accept jurisdiction over Plaintiffs' Administrative
    Complaint and remand the Administrative Complaint to the agency to undertake the
    complaint investigation procedures set forth in 40 C.F.R. Part 7 in compliance with the
    timelines set forth in those regulations.

3.  Award Plaintiffs reasonable attorneys' fees and costs under the Equal Access to Justice
    Act.

4.  Provide all other necessary and appropriate relief that justice may require.


  Dated: January 13, 2021

By their attorneys,

 /s/Lauren Sampson
Lauren Sampson (BBO # 704319)
Oren Sellstrom (BBO # 569045)
Lawyers for Civil Rights
61 Batterymarch Street, 5th Floor
Boston, Massachusetts 02210
Tel: (617) 988-0609
lsampson@lawyersforcivilrights.org
*Attorneys for GreenRoots, Inc.*

/s/ Joshua M. Daniels
Joshua M. Daniels
The Law Office of Joshua M. Daniels
P.O. Box 300765
Jamaica Plain, MA 02130
Tel: (617) 942-2190
Fax: (617) 507-6570
jdaniels@danielsappeals.com
*Attorney for GreenRoots, Inc.*

 /s/ Caitlin S. Peal Sloan
Caitlin S. Peale Sloan (BBO #681484)
Amy Laura Cahn*
Erica Kyzmir-McKeon*
Conservation Law Foundation
62 Summer Street, Boston, MA 02110
(617) 850-1730
cpeale@clf.org
*Attorneys for Conservation Law
Foundation*

*Motions for pro hac vice forthcoming*